The final case in our call this morning is case number 107550, People v. State of Illinois v. Sandy Williams. Bear with us for just a second. You may proceed. Good morning, Your Honors. I'm going to please the Court. My name is Brian Carroll for Sandy Williams. And with the Court's permission, I will be swapping the orders of my issues. I'll be arguing the Confrontation Clause issue first. And if there's any time remaining, I'll address the foundational issue. In this case, the State's expert witness, Ms. Lambatos, testimony regarding the DNA analysis that purported to establish the DNA profile of the offender in this case, in which she took no part, violated Mr. Williams' right to confrontation, as interpreted by the United States Supreme Court in Crawford v. Washington and recently clarified in Melendez-Diaz v. Massachusetts. In Melendez-Diaz, the U.S. Supreme Court held that reports of forensic testing that established facts used to prove a defendant's guilt constitute testimonial statements. And the use of those statements at trial violates the Confrontation Clause if the defendant is not given the opportunity to confront the analysts that perform the testing. And that is what happened in this case. Is there any distinction, Mr. Carroll, that in Melendez-Diaz, which was decided after the appellate court case here, right? Correct. All right. Is there any distinction that the affidavits in question were actually introduced into evidence in that case, and in this case Lombatos, if that's pronounced correctly, was merely allowed to testify about the reports and how they influenced her opinion? Your Honor, it's a distinction but without a difference. In both cases, as was the case in Melendez-Diaz, here at Selmark's report was produced in response to a police request in part of their investigation of this crime with the specific intent of obtaining evidence for the subsequent prosecution. Now, so that makes this report testimonial. The fact that the conduit through which the statement was presented to the jury instead of a written document, as in Melendez-Diaz, its expert testimony here, makes no difference. It's essentially considered in Melendez-Diaz, had instead of the affidavits been given to the jury, the state in that case gave the affidavits to an expert, and that expert just read the affidavits and presented the substance through opinion testimony. Now, there's no logical difference between these two scenarios of what happened in my hypothetical. It's the same statement coming in for the same substantive reason. So there's just the fact that it's... Counsel, did the witness actually testify to the content of that report? She didn't, like, read off what the profile actually was. However, she did testify that the profile was derived from the semen taken from the victim. And that's information, too, and that's part of the Selmark statement. If she just testified to, like, this, the allele chart, well, that's all fine and good. But unless that allele chart is connected to the semen taken from the victim, then the fact that she's able to match William's profile to the profile she obtained from Selmark is meaningless. So her statement that Selmark provided a profile that it derived from the semen sample, that's the statement, that her profile that she used was derived from the semen sample. Was the report admitted into evidence? No, the report itself was not admitted into evidence. Wasn't the report used to render an opinion? Isn't that the purpose of it? Isn't that the theory that the opinion is based upon a document that is considered to be reliable within the field? Well, Your Honor, in this case, the... This is not, like, a typical 703 case where there's a menagerie of items that an expert testifies to relying on and coming to their... Such as in Lovejoy. Such as in Lovejoy, correct, Your Honor. Here, what Lombardo's testimony was, or her opinion was, William's profile matched Selmark profile. That's what her opinion was. So the fact that... Or that Selmark's profile was, in fact, the profile of the offender in this case, was a fact the trier of fact necessarily had to believe to be true in order for Lombardo's opinion to have any meaning. And there's no getting around that. Now... So what you're basically saying is, you know, Wilson v. Clark is implicated in the sense that an expert... It's not hearsay under Wilson v. Clark. It's only a basis of the opinion when they look at reports. But Melendez-Diaz seems to carve out a change as it relates to Wilson v. Clark in the sense that if the reports say DNA match and the opinion is DNA match, and that's what you're relying upon, it is offered for the truth. Is that basically your... Yeah, that's correct, Your Honor. Let me ask you one question. Sure. I think the name of the new case is Briscoe. Is that correct? Briscoe, yeah, v. Virginia, I believe. It was argued on Monday. Yes. Is there any thought that we should wait to deliver this opinion until after Briscoe is out? Well, from my understanding of that case, the issue is whether or not... Business records. Hmm? Business records. Was it business records? If I'm correct, that case is whether or not a state statute allowing the defendant to call the expert on their own to testify, unless I'm getting it wrong, that was my understanding of the case, and whether or not this particular state statute was sufficient to, you know, cure any confrontation clause problems, but that at least as the defendant was presenting the issue, it was assuming that the statements are testimonial hearsay. Does this state statute, evidentiary statute, provide a proper opportunity for cross-examination? But as I said, I might be wrong on that, and I apologize. And if this Court would like further briefing on that issue, I would be willing to. I'm not sure you finished your answer regarding Wilson v. Clark and whether this is hearsay or not. Okay. Yes, to the extent that evidence or testimony out-of-court statements relied on by an expert must be considered as true by the trier fact, as it is in this case, to that extent, I believe Crawford and Lendis-Diaz do overrule Wilson v. Clark, because Wilson v. Clark and the rationale behind 703 itself is reliability, that if, you know, if experts, if it's reliable enough for experts in the field to, you know, deal with on their day-to-day basis. Yes, and the basis of that is very skilled people make decisions based upon that evidence all the time. Correct. There's no reason we shouldn't give them the same opportunity here in court. That's correct, Your Honor. However. If I could ask a follow-up question. Sure. Isn't it at least the theory that the reports emanating from Selmark fall into that category of reliability? Yes, if I believe under 703, normally under 703, without considering any confrontation clause issues, yes, I think they would fall under that. However, the U.S. Supreme Court has made quite clear in Crawford and, again, in Lendis-Diaz, that for confrontation reasons, reliability is not the measure. You know, they can be as reliable as it gets. However, if the defendant is not given the opportunity to cross-examine, there's a violation. So the reasoning, as I argued in my brief, the reasoning behind 703. Is that only counsel when the ‑‑ is the Wilson v. Clark rationale only overruled by Melendez-Diaz in cases when the actual opinion is basically the same as the report? I mean, we're not saying that anything that any expert relies upon raises to the level of the Melendez-Diaz line of thinking, right? It's only here it's like DNA evidence match, my opinion, there's a DNA evidence match, and the only thing I reviewed are these reports. Or is it just wholesale now? Well, like in this case, Selmark's report wasn't that there was a match there, it was just the DNA profile of the offender. Okay. And now I'm arguing that to the extent that the information and data relied upon by the expert, to the extent that the trier fact necessarily had to accept that as being true, then it really is being offered for its truth, not merely background information. And so to that extent, then Melendez-Diaz would overrule Wilson v. Clark. But in other cases where any civil case, you know, Confrontation Clause has no attachment to that, so Wilson v. Clark would be quite alive and well. But to the extent, as here, where the expert is truly acting more as just a conduit for the out-of-court statement, then to that extent, Melendez-Diaz and Crawford do supersede the evidentiary rule of Wilson v. Clark. So I'm sort of already given my spiel on why I believe it's a testimony of hearsay or being required to, the trier fact is required to understand for the truth. But it's also testimonial. As I said, it was produced at the request of the police. It was just pretty much the product of police questioning, which falls right into the general scope of testimonial statements as stated in Crawford, Melendez-Diaz, and this Court's opinion in Speckley. In its briefs, the State makes some arguments of why it's not testimonial. However, all the rationale used by the State was flatly rejected by Melendez-Diaz. First, that the statement itself isn't accusatorial. Well, the statement in Melendez-Diaz wasn't by itself accusatorial. Melendez-Diaz's Court stated that so long as the statement provided a fact used to establish the defendant's guilt, then it's testimonial. It's a business report. Again, Melendez-Diaz's Court held, well, if the report was produced solely for the purpose of litigation, it doesn't qualify under the business report hearsay exception. And further, even if it did qualify as a business report, it was still testimonial in nature. And the fact that something qualifies under the business record exception to the hearsay rule doesn't magically transform a testimonial statement into a non-testimonial statement. It's the nature of the statement that's important. And finally, the Court asked this Court to follow the California Supreme Court's decision in People v. Guyer. I believe I'm pronouncing that correct. But again, the rationale in Guyer was completely rejected by Melendez-Diaz. They, again, followed the, oh, it's not accusatory. Well, by itself. But Melendez-Diaz says that's not controlling. And then they finally argue that it's, oh, it's not traditional, just the testimony of a witness to past events. This is scientific evidence. Well, Melendez-Diaz, again, directly addresses and rejects that. So based, I think this Court is, or sorry, this case is directly analogous to Melendez-Diaz. The only difference is the conduit through which the out-of-court statement was presented by the trier of fact. Finally, just to further illustrate this point, consider what if cell marks analysts did come and testify live. But their testimony was, we screwed up. Due to some procedural error, the profile we provided, Ms. Lombardo's, is inaccurate. Would that affect this case? Would that affect the quality or the reliability of Lombardo's opinion? Of course it would. I don't think it could rationally be argued that it wouldn't. So if the accuracy of cell marks report matters there, it matters here. Same statement coming in for the same substantive reason. And there's just no getting around it. Whether you call it, evidentially rules call it non-hearsay exception or whatever is irrelevant. This is not an argument about nomenclature. This is how is this evidence actually being used at trial. And here the evidence was being presented to the trier of fact, and the trier of fact necessarily had to accept it as being true, and therefore it was testimonial. My time is up, so unless the justices have any more questions, I will end. Thank you. Good afternoon, Mr. Chief Justice, Honorable Justices, Counsel. My name is Amy Wotroba Kern. I'm an Assistant State's Attorney from Cook County here on behalf of the people of the state of Illinois. This Court need not reach the issue of whether there was testimonial hearsay in this case because the Confrontation Clause issue that defendant raises can be disposed of with the preliminary question of whether there was even hearsay, just as this Court recently did in People v. Lovejoy. Here, Sandra Lombatos was not merely a conduit for a report written by Selmark. Rather, she was an expert who was qualified as an expert in forensic DNA analysis and forensic biology. She testified to her own opinions regarding both the male DNA profile that was extracted from the vaginal swabs as well as the ultimate DNA match, which in her opinion was a match between the vaginal swabs and defendant's DNA profile. Selmark did not process defendant's blood standard. That was done at the Illinois State Police lab. Selmark did not conduct any comparative analysis. That was all done by Sandra Lombatos. She took the data that was generated by both Selmark, and then we also had two other analysts that also testified, Ms. Coy and Mr. Haypack, took all of that data, reviewed it all, reached her own independent conclusions. She importantly reviewed the electropharograms on the E2 fraction and concluded she ultimately did concur with Selmark's opinion, excuse me, Selmark's conclusions regarding the profile. Selmark issued its opinion in the written form and sent it to Illinois, is that correct? That's correct. It was after that that an independent examination was done by Illinois employees? Well, with respect to the vaginal swabs, there was initial work done on the samples by Brian Haypack. He did the initial. It's an Illinois employee. Correct. And he testified at trial. That was the initial, the preliminary test for the presence of semen on the extractions after the sex assault kit was taken. And the semen is what was sent to Maryland? The vaginal swabs, those samples, after he did the initial test, the acid phosphatase and the abacard, and they tested positive, that was then packaged as well as the victim's blood standard, and that was all sent to Selmark. The comparison was not done in Illinois? No, the comparison was done by Sandra Lombatos, the person who testified at trial. She did the comparative analysis. After Selmark did the laboratory work on the diffraction extraction and the amplification and then the capillary electrophoresis on the vaginal swabs, then that evidence, as well as their report, the electropharogram, which is really key here, because that's the graph, for lack of a better word, that has all the peaks, that indicates, that then is interpreted by forensic DNA experts to determine what alleles are present in each particular locus. That, coupled with the allele charts and Selmark's report, was all sent back to Illinois State Police. Melendez-Diaz was a forensic report? It was in a drug case, yes. And how do you distinguish that case? Well, first, Melendez-Diaz involved a certificate of authenticity. It was an affidavit, actually, more like form, written by a chemist that affirmed, based on the testing I did, in my opinion, this was positive for the presence of, I believe, it was cocaine. And so that first distinguishes it, because it was more akin to an affidavit. Second, and probably most distinguishing, is the fact that a document was admitted into evidence without calling an author of the document. Here, no such hearsay was admitted. Here, Sandra Lombatos, a conclusion or an opinion or a report generated at Selmark was not admitted at defendant's trial. You heard Mr. Carroll at the conclusion of his remarks that the fact that the results of those tests showed a match with defendant's DNA was obviously a primary fact that the jury would have considered in convicting the defendant, right? It wasn't, again, the conclusions at Selmark didn't show a match. All that Selmark did was deduce a male profile. The E2 fraction in this case was a mixture. When they separated out the epithelials from the semen or the sperm cells, the E2 still resulted in a mixture. So there was both female DNA and male DNA. And so there were the presence of alleles from two individuals. And Lombatos testified that, in her opinion, there were two people in this profile in the E2 fraction. And then she subtracted out the victim standards, and there was the deduced male profile. Now, initially that was done at Selmark, and then it was sent back to ISP. Those alleles were entered into the database. That's how an association then was later generated, just an association after defendants. What do you mean by just an association? Because in the meantime, while this was going on, this was a no-suspect case, defendants, an order was generated for defendant standard. So defendant standard was taken separate and apart from this, and was worked up by Karen Coy Abinatti, and then those alleles were entered into the database. There was a computer association generated. And at that point, it was just like the investigation, the initial link-up. And at that point, Sandra Lombatos then took all of the data from both the vaginal swabs and defendant's blood standard, and she reviewed it all, and she reached the conclusion regarding the match, and she testified at trial and was subject to cross-examination. So in Melendez-Diaz, you have a report that says the substance is cocaine, I believe, in that case. Correct. In this case, you have data that requires processing by an expert, and the opinion itself is what the jury hears, that this profile equals a match. I'm sorry, could you repeat the last part? I lost you on the last part of that. In Melendez-Diaz, a report says the substance is cocaine. Correct. Admitted into evidence. Correct. In this case, what you say is the non-hearsay are these reports that don't show a match, and what really indicates a match is the testimony of the expert. Correct, correct. And in addition to that, too, you have she not only testified to the match, she also testified to the same analysis done, the same conclusions reached at Selmer. I guess I would maybe provide an example to illustrate this point. It would be a photograph. If I was an expert and took a photograph of a blue car for use in a case, I am not the only person that could come to court and testify that this is a photograph of a blue car. Anyone who could establish that they were not color blind and that they were familiar with the color blue could give their own opinion that this was a photograph of a blue car. It's the same with Sandra Lombatos in this case. It's the electropharogram. Any forensic DNA scientist can look at an electropharogram, as she did in this case, and based on her expertise, she was qualified without objection, and her awareness of all the procedures and the PCR methodology could reach her own opinion regarding what that electropharogram said. Mr. Carroll would say, though, that there's nothing to indicate that that data is correct. No one came in and testified who took the samples, for example. But Ms. Lombatos testified that the profile was correct. She reviewed because she looked at the electropharogram and then testified. Actually, to each locus. The process that came up with the data, she couldn't testify. But the process is not hearsay. The process is not a statement. The process is not, again, is not a readily identified, it's not a hearsay statement. Who did testify were, you know, Brian Haypack, who did the initial testing and also identified, I believe it was people's exhibits one and two, as the actual physical evidence that then was later tied in through all the other experts, and then Sandra Lombatos. And she was subject to cross down to each and every locus. The alleles reported at each and every locus. There was no additional statement that was presented against defendant that he never had an opportunity to confront. That's really a fiction. And I think actually perhaps what best illustrates the distinction would be a case that defendant relied on in his briefs, and that's a Michigan case. I believe it's People v. Lonsby. And in that case, I believe it was a DNA case, the prosecution called a witness to testify to DNA tests done by another analyst. But the prosecution didn't ask any questions of the analyst who was present in court regarding what his opinion was of the evidence. Rather, that analyst basically just sat up there and read and regurgitated the work done by another analyst. And that perhaps illustrates also the difference between the scientific process and the actual reality of the testimony that was elicited at trial. And this case really is just like Lovejoy in that the out-of-court issue or statement report that defendant's complaining about was really just one thing that Lombatos relied on in reaching her opinion. And in that case, obviously, as courts were in Lovejoy, it was a medical examiner with a toxicology report. Lombatos generated information that was different in addition to what they'd gotten back from Sober. Generated? She didn't do any lab testing in this case. She didn't do actually any of the mechanical bench work. The Illinois lab did, though. The Illinois lab did, yes. They did the initial. But nobody from the Illinois lab other than Lombatos testified. No. Brian Haypack testified and Karen Cooley-Abenati also testified. So there were three forensic scientists who testified. Lombatos was the only one who testified regarding the match because she did the match. I don't know if you answered this question in response to Justice Thomas' questions, but if I understand you correctly, you're saying there's no hearsay problem here because the report from Selmark was not introduced into evidence. However, Mr. Carroll says if the report from Selmark is flawed and the expert relies on that, then the expert's opinion is flawed. Is there a remedy for this for the defendant? I would say, Your Honor, that the question you've just asked isn't implicated in defendant's confrontation clause argument. That's more of an issue for his foundation argument. Sometimes I think he somewhat conflated the two issues. They're definitely two distinct issues. So the remedy, to answer your question, as we discuss in Argument 1 in our brief, would be cross-examination. Sandra Lombatos' testimony met the threshold reliability standard for admission of expert testimony under Wilson v. Clark in 703, and any perceived weaknesses in that testimony or any perceived problems with her reliance on bench work that she did not personally witness would be a subject for cross and, in fact, was a subject for cross in this case. However, I think Mr. Carroll is indicating he had no opportunity or defense counsel had no opportunity to cross-examine Selmark with regard to its procedures in following what would be normal and standard and correct in generating the report that came to the expert. He didn't have an opportunity to cross-examine Selmark, but, again, the procedures and the actual mechanical lab work is not hearsay. It's not a statement that's admitted against him. It becomes relevant under the foundation argument, but as far as the confrontation clause argument really applies to hearsay statements, and it has to be testimonial hearsay to boot. So the only thing, and he doesn't really identify it, the only, I think, possible thing that could qualify as a statement would be the report, the actual paper generated by Selmark, but as I've discussed, that wasn't admitted, and so it wasn't used against him, so there was no competition. So Melendez-Diaz would have come up with a different result if instead of a report that came into evidence, an expert would have testified based on that report that I'm looking at, but I'm not going to get admitted into evidence. Based on that report, this is cocaine. That's the distinction because opposing counsel would say that the results of the analyst's report relied on by the expert in this case are the same as the results of the test regarding cocaine, and the same analysis would apply that Melendez-Diaz applied. I would say no. First, the science is different, and the reason it was admitted, there was no admission of the match in this case and the evidence she relied on to reach that match was not prima facie evidence of the defendant's guilt. It wasn't an element of the offense. So that would distinguish Melendez-Diaz. Also, Melendez-Diaz, it's interesting that Justice Thomas based his agreement, his concurrence, on the fact that this was an actual affidavit, that it was paper that was admitted. And some would read from that that possibly when the court later, perhaps someday in another case, gets to the issue of expert basis testimony, that that would be an important distinction for him. The court generally held that a certificate detailing an analysis that a substance seized from the defendant was cocaine would be a testimonial statement. They held that the affidavit, the certificate, yes, written by an analyst saying that this is cocaine based on my testimony. I have to admit, I don't understand the argument that, in this case, the analysis done somehow because the science was different that the same rule wouldn't apply. Maybe some of your other arguments I understand. I don't understand that one. Okay. The affidavit in Melendez-Diaz, or the certificate of authenticity, I'll call it an affidavit, gave the results of the test, the GCMS machine test. So it was, this substance is cocaine. I guess if I was going to draw an analogy between a document that would have been implicated in de-analysis, it would be to the allele chart that maybe Cellmark generated that said, this is the deduced male profile of the male donor in the vaginal swab. That would possibly be the closest analogy. But again, that's the key to this analysis. No, the electropharogram is really the key to the analysis. The electropharogram, the actual data, the graph with the peaks is really what's key to the analysis and the fact that she interpreted that. She didn't just blindly accept a chart of numbers. She actually looked at the data and based on her expertise, Sandra Lombatos, I'm sorry, the woman who testified, she actually looked at the data in the E2 fraction and said, based on my interpretation and my expertise, these alleles are present at this particular locus. And went down, I think, through almost all 13 of the loci. So mostly on cross-examination. So the science is different. She wasn't able to testify that any of that was done accurately, other than by citing the Cellmark's expertise. She was able to cite to the accreditation process and the attendant procedures, as well as her knowledge of the PCR procedure, and she was also able to glean that from the electropharogram. She specifically testified that if there had been degradation of the sample, if there had been contamination or anything of that nature, that that would have been readily apparent from the electropharogram. Again, that's why it's key. Because, for example, with degradation, the peaks would be less defined. She is an expert in this particular discipline, was able to testify based on the data that none of those things happened. Any of those issues would have been readily apparent on the electropharogram. Counsel? Yes. Did the information on the peaks come from the Cellmark report? It was part of the packet that would have gone back from Cellmark to ISP. Did it come from any source except Cellmark? It was generated at Cellmark after their lab testing. Yes, it would have been the results. Has this forensic expert been able to give an opinion without the Cellmark information? Well, without the, since Cellmark did the lab work, there would have been no, there would have been the existence of a male profile. It would have just been nonexistent. So she wouldn't have had any data. I mean, it really would have been no different if, no matter where the lab work had been done. The difference is, does she have to personally do it, which is what the defendant is actually saying. And no, she doesn't. That's the people's position that under 703, and Wilson v. Clark, that she doesn't have to physically do the testing. It's very clear that experts, and this kind of goes more toward the foundation, that experts may base their opinions on firsthand observations, hypotheticals, or data presented to them outside of court. That position on the foundation would effectively limit that to firsthand observation. Ms. Kern, I see your light's on. Could you touch upon the cross-appeal? Yes, of course, Your Honor. The people, as we outlined in our brief, ask this court to reconsider its judgment in People v. Palmer. This case illustrates the inherent flaw in the Palmer court's analysis, and the people believe that we've shown that good cause exists to depart from that opinion. Based on the fact that both in this case and also the Dixon and Spears and other appellate court cases outlined in our brief, many appellate courts throughout the state, I think with the exception of People v. Petrenko, have taken the Palmer analysis, applied it to cases where there's natural life and a term of years, and found that those cannot be consecutive. Here, the plain language of the consecutive sentencing statute mandated consecutive sentences, and the trial court properly imposed them. In the alternative, we ask that this court limit application of Palmer to cases involving multiple natural life sentences, but it would be our primary position to respectfully request this court to reconsider its judgment in Palmer. For those reasons and those outlined in our brief, we would ask this court to affirm defendant's conviction and to reverse the appellate court's judgment with respect to sentencing and affirm the trial court's judgment in imposition of consecutive sentencing. Thank you. Well, first to address counsel for the other side's mentioning of all the analysts who testified regarding William's blood sample and the DNA taken from that. That's irrelevant for this issue. That just has no bearing on whether or not Thelmark's report was testimonial or not. Second, let's focus on what did Lombatos do here. She testified that she did not get any of the raw data. She only got one of the electropharogram. And in her own words, she testified that Thelmark made the deduced male profile. That was put into the database, and then it was generated. The match was generated. So what did she do? She matched numbers. Yes, she did a review of one electropharogram to make, okay, so preliminary acceptance of Thelmark's profile. But she based her opinion on Thelmark's profile. And her opinion was just the match. That's her opinion. But if Thelmark's prior effect doesn't believe that the profile she was given was actually the male profile of the offender, then the fact that it matches doesn't matter. That's all that Lombatos did here. The testimony about going over the electropharogram and stuff, great. Well, again, if the electropharogram is not true, her testimony doesn't matter. The Melendez-Diaz court emphasized the importance of the ability of the defendant to cross-examine the actual analysts in order to satisfy the confrontation clause. And here Lombatos, yes, she testified, oh, you know, they're certified, so they're supposed to maintain given, you know, safety procedures. She didn't say what those procedures were. She didn't say what or who certified them. She didn't testify that any sort of safety protocols were engaged in this case. She didn't review what they did. She didn't, you know, review anything other than just, you know, one looking at this electropharogram, which as counsel described is just a graphical representation of some data. So and then is the statement that counsel keeps stating that, oh, no statement from Thelmark was made. Well, if the trier of fact doesn't accept that Thelmark's profile was that of the offender, then nothing's worth, you know, her opinion's worth a hill of beans. That statement that this profile, this electropharogram came from the semen sample, that statement was made by Thelmark. That wasn't made by Lombato's. That was made by Thelmark. And that statement has to be accepted as true by the trier of fact in this case. Counsel, how is this, is it different or the same as a medical examiner testifying based upon blood test results, tissue evaluations and so forth that he or she may not have done personally but receives from a lab? Well, I think it would depend on the actual ultimate opinion. If it's a situation where the blood exam itself has to be true, the trier of fact has to believe the blood exams to be true, then I think the confrontation clause would be. So if the medical examiner is going to testify to cause of death based upon these samples, then all the people that did the sample work and did the tests would have to testify. Well, I think like say in Lovejoy where the examiner did look at a toxicology report, but did their own analysis as well looking at the body. And the report, I think the language this court used was provided insight. Here, or in that situation where the trier of fact wasn't completely necessary for the trier of fact to, you know, accept that toxicology report to be true. Here it is necessary for the court or for the trier of fact to accept the statement that the blood test was true. And that the profile cell mark produced was from the semen sample to be true. So it goes down to whether or not the trier of fact has to believe the evidence to be true. And a statement is hearsay if its relevance is tied to its reliability. And in this case, the relevance of cell marks, their statement that their profile was that of the male offender in this case, the accuracy of that is what makes it relevant. Therefore, it makes it a hearsay statement regardless of how it's labeled by the rules of evidence. Is the difference here that the U.S. Supreme Court has set aside the importance in criminal cases of reliance on reports that are submitted as not true in other kinds of cases where you could rely upon reports submitted by others who did not actually do the investigation or the testing? I believe that's correct, Your Honor. In terms of evidence coming in under 703, yeah, I think it's different in a criminal case because, well, the Confrontation Clause doesn't apply in any other cases. And the ability for the defendant to defend himself against the evidence of the crime or the evidence presented against him is critical. And that's what makes this case different than, say, a tort case involving medical testimony. There's different concerns involved. Seeing that my time is up, I'll just quickly respond to the cross-appeal, say that, you know, I believe Palmer, as I argued in my brief, Palmer is a, the reasoning is sound. And as the State mentioned in its brief, the statute regarding consecutive sentences has been amended. No offense, Palmer, but if Palmer and the cases, the appellate cases that have applied its reasoning to sentences that are terms of years, so offended the legislature, one would think that they would have amended or put some language in the statute in these amendments showing a desire to supersede Palmer, and they haven't. So I'll just conclude in asking that this Court remand or reverse Mr. Williams' convictions and remand for a new trial. Thank you. Thank you, Counsel.